**Dennis DIGIORE et al., Plaintiffs,**

v.

**STATE OF ILLINOIS, George Ryan, both as Secretary of State and individually, and Giacomo A. Pecoraro, both as Director of the Department of Police and individually, Defendants.**

**No. 96 C 1785.**

United States District Court, N.D. Illinois, Eastern Division.

March 27, 1997.

Jac A. Cotiguala, Law Offices of Jac A. Cotiguala, Chicago, IL, for plaintiffs.

Gary Michael Griffin, Cara LeFevour Smith, Illinois Attorney General's Office, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiffs are police officers employed at the Illinois Secretary of State Police Department. They have filed suit against the State of Illinois, as well as Secretary of State George Ryan and Director of Police Giacomo Pecoraro, in both their official and personal capacities, alleging that the defendants deprived them of overtime and other pay in violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, and the Illinois Minimum Wage Act, 820 ILCS 105/1 *et seq.* As redress, plaintiffs request that this Court order defendants to pay the wages to which the Act entitles them, along with liquidated damages and attorneys' fees. The defendants have responded with a motion to dismiss, contending that Eleventh Amendment immunity strips the Court of subject-matter jurisdiction. This dispute requires the Court to delve into the doctrinal snare that is the Eleventh Amendment, and determine its state following the Supreme Court's latest pronouncement on sovereign immunity in *Seminole Tribe v. Florida,* —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

### RELEVANT FACTS

The Fair Labor Standards Act ("FLSA") provides covered employees with maximum hour and minimum wage protections. Under the Act, employers are generally prohibited from imposing work weeks longer than forty hours without compensating their employees one-and-one-half times their regular wages. 29 U.S.C. § 207(a). Public agencies and their employees, at one time excluded, became subject to the Act in 1974. The Act now protects employees at state agencies unless their duties or salary render them "bona fide executive, administrative or professional" workers. *Id.* § 213(a)(1); *see* 29 C.F.R. § 541.1(f).

Digiore and the other plaintiffs hold the rank of sergeant or higher at the Illinois Secretary of State Police Department, and are compensated on an hourly basis. Compl. ¶ 14; Pl. Resp. at 1. Their central allegation is that the defendants require them to work overtime without time-and-a-half pay. *Id.* ¶ 16. In addition, plaintiffs allegedly perform numerous duties uncompensated—working through lunch, reviewing paperwork that reporting officers generate after the shift has ended, and reporting and responding to telephone beeper calls before the shift

begins. *Id.* ¶ 17. Responsibility for these policies, which plaintiffs claim violate the FLSA and Illinois' Minimum Wage Law ("IMWL"), allegedly lies with Secretary Ryan and Director Pecoraro. Plaintiffs seek to hold Ryan and Pecoraro, both individually and in their official capacities, jointly and severally liable with the State of Illinois for unpaid wages, unpaid overtime, and liquidated damages, plus reasonable costs and attorneys' fees.

Defendants have moved under Federal Rule of Civil Procedure 12(b)(1) to dismiss this suit for lack of subject matter jurisdiction, arguing that they are immune from prosecution under the Eleventh Amendment. Defendants claim that Congress no longer has the power to abrogate state immunity under FLSA, that Illinois and its two defendant officials have not waived their immunity to suit in federal court, and that this immunity extends to Ryan and Pecoraro in their personal capacities. The Court agrees that the State of Illinois is immune to suit in federal court. But we find that, while the individual defendants likewise enjoy immunity in their official capacities, they remain personally subject to this lawsuit. Accordingly, the Court grants the defendants' 12(b)(1) motion in part, and denies it in part.

## LEGAL STANDARDS

### I. Legal Standards Applicable to 12(b)(1) Motions

Rule 12(b)(1) requires that an action be dismissed if the court lacks jurisdiction over the subject matter of the suit. *Montgomery Ward & Co., Inc. v. Warehouse, Mail Order, Office, Technical & Professional Employees Union, Local 743*, 911 F.Supp. 1094, 1099 (N.D.Ill.1995). In the absence of evidence raising a fact question as to jurisdiction, the Court's inquiry is limited. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), *overruled on other grounds, Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). We simply ask whether the complaint's allegations, construed in the light most favorable to the plaintiff, are sufficient to support jurisdiction. *Id.*; *Bergemann v. Rhode Island*, 958 F.Supp. 61, 65 (D.R.I. 1997). Although a factual dispute over jurisdiction should prompt the court to hold an evidentiary hearing and weigh the conflicting evidence to determine whether jurisdiction exists, *see Bowyer v. United States Dep't of Air Force*, 875 F.2d 632, 635 (7th Cir.1989), where the jurisdictional facts "are relatively simple and substantially uncontroverted," as they are here, "the court may rule on a 12(b)(1) motion without pausing to make findings on disputed questions of fact." *Bergemann*, 958 F.Supp. at 65 (quoting *Commodities Export Co. v. United States Customs Serv.*, 888 F.2d 431, 436 (6th Cir.1989)) (internal quotations omitted).

### II. Legal Standards Governing Eleventh Amendment Immunity

The Eleventh Amendment bars suits brought by private parties in federal court against unconsenting states. *MSA Realty Corp. v. State of Illinois*, 990 F.2d 288, 291 (7th Cir.1993). The bar is jurisdictional, not prudential; "the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 98, 104 S.Ct. 900, 906, 79 L.Ed.2d 67 (1984). It applies "regardless of the nature of the relief sought." *Id.* at 100, 104 S.Ct. at 908. When state officials are named defendants, the question of immunity becomes more complicated—the Court must ask whether "the state is the real, substantial party in interest." *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945). This is the case "when the action is in essence one for the recovery of money from the state," entitling the state "to invoke its sovereign immunity from suit even though individual officials are nominal defendants." *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974) (quoting *Ford Motor Co.*, 323 U.S. at 464, 65 S.Ct. at 350–51) (internal quotations omitted). In practical terms, this means that private plaintiffs may not sue state officials requesting money damages or seeking injunctive relief that would require retroactive payments from the state treasury. *MSA Realty*, 990 F.2d at 291–92.

■ Federal courts may, however, entertain suits that allege federal statutory or constitutional violations on the part of state officials. *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Still, if the officials are sued in their official capacities, the court is limited to issuing an injunction contemplating prospective relief; it cannot award money damages. *MSA Realty*, 990 F.2d at 291. Damages are available only to plaintiffs suing state officials in their personal capacities; and even then, relief is confined to the official's personal assets. *Kentucky v. Graham*, 473 U.S. 159, 165–66, 105 S.Ct. 3099, 3104–05, 87 L.Ed.2d 114 (1985).

■ These rules of sovereign immunity are not without exceptions. In fact, there are two: the state may waive its immunity by consenting to be sued in federal court, or Congress may use the increasingly disfavored mechanism of abrogating sovereign immunity through a statutory enactment. *MSA Realty*, 990 F.2d at 291; *see Seminole*, ―― U.S. at ――, 116 S.Ct. at 1131–32 (holding that Congress can no longer invoke its powers of abrogation under Article I of Constitution). Waiver will be found "only where stated by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction." *Edelman*, 415 U.S. at 673, 94 S.Ct. at 1361 (internal quotations and citations omitted). Similarly, to abrogate state immunity, Congress must "mak[e] its intention unmistakably clear in the language of the statute." *Seminole*, ―― U.S. at ――, 116 S.Ct. at 1123 (internal quotations and citations omitted). These stringent standards for waiver and abrogation derive from dual considerations: "first, that each State is a sovereign entity in our federal system; and second, that [i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent.'" *Id.* (*quoting Hans v. Louisiana*, 134 U.S. 1, 13, 10 S.Ct. 504, 506, 33 L.Ed. 842 (1890)).

With these standards in mind, we proceed to evaluate the parties' jurisdictional arguments. First, we consider whether Congress has abrogated state immunity under the FLSA. Answering that question in the nega-

tive, we determine whether the defendants have nevertheless waived their immunity to suit in federal court. Although we find no waiver, and therefore dismiss the State of Illinois and the individual defendants in their official capacities, we retain Ryan and Pecoraro as defendants in their personal capacities.

## ANALYSIS

### I. Abrogation

■ We begin our analysis by noting that, absent abrogation or waiver, the state and its officials, as officials, are immune to this suit because Digiore [1] requests only retroactive relief in the form of money damages. *See MSA Realty*, 990 F.2d at 291 ("Under the prevailing view of the [Eleventh] amendment, a state cannot be sued in federal court for monetary damages.... The eleventh amendment bar extends to suits for money damages against state officials sued in their official capacities...."). While he seeks, in addition to liquidated damages, what could be construed as an injunction—a court order to remit unpaid wages—this has the obvious effect of requiring payments from the state treasury, prohibited by the Eleventh Amendment. *Id.* at 292 ("The [Supreme] Court has never approved an order against a state official that would have the effect of requiring a state to make retroactive payments...."). Digiore urges that the abrogation exception applies to nullify this clear immunity—he claims that in enacting FLSA, Congress possessed both the power and intent to subject states to suit in federal court.

### A. Congress Intended to Abrogate State Immunity Through FLSA

■ There are two prerequisites to congressional abrogation: first, Congress must have "unequivocally expresse[d] its intent to abrogate the immunity"; second, Congress must have acted "pursuant to a valid exercise of power." ―― U.S. at ――, 116 S.Ct. at 1123 (quoting *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 425–26, 88 L.Ed.2d 371 (1985)) (internal quotations omitted). With regard to intent, "[a] general

---

**1.** From this point forward, we use Digiore to refer to the plaintiffs collectively.

authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment." *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 246, 105 S.Ct. 3142, 3149, 87 L.Ed.2d 171 (1985). Section 216(b) of FLSA provides that "[a]n action to recover [unpaid wages, overtime compensation and an equal amount in liquidated damages] may be maintained against any employer (including a public agency) in any Federal or State court...." "Employer" means "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency...." 29 U.S.C. § 203(d). "Public agency" includes the state and its agencies. *Id.* § 203(x). Finally, "employee" includes "any individual employed by a State, political subdivision of a State or an interstate governmental agency," with a few exceptions. *Id.* § 203(e)(2)(C). Such abundant references to the "State," in conjunction with language authorizing suit in federal court, are sufficient to constitute intent to abrogate. *See Seminole,* —— U.S. at ——, 116 S.Ct. at 1124. Moreover, since FLSA's 1974 amendment, which swept states into the Act's purview, courts have consistently held that Congress clearly intended to subject states to suit under the Act. *See Brinkman v. Kansas,* 21 F.3d 370, 371–72 (10th Cir.1994) ("Congress made clear in the FLSA its intention to override the Eleventh Amendment."); *Hale v. Arizona,* 993 F.2d 1387, 1392 (9th Cir.1993) (en banc) ("The specific inclusion of 'public agenc[ies]' and the addition of 'any Federal or State court' make the intent of Congress to render states amenable to suit under the FLSA in federal court unmistakably clear."); *Wilson–Jones v. Caviness,* 99 F.3d 203, 207 (6th Cir.1996), *amended on denial of reh'g,* 107 F.3d 358 (6th Cir.1997) (same); *Taylor v. Virginia,* 951 F.Supp. 591, 594 (E.D.Va.1996) ("We have in this [FLSA] case such an unmistakably clear statement of Congressional intent to abrogate the States' sovereign immunity."). We agree with these decisions that FLSA provides far more than a mere general authorization for suit; it specifically encompasses states and exhibits a clear intent to submit them to federal jurisdiction.

**B. Congress Has Not Acted Pursuant to a Valid Power**

The more substantial question, however, is whether Congress was acting pursuant to a valid power in this endeavor. It is clear that, in enacting FLSA, Congress relied, at least in part, on the Commerce Clause. FLSA's statement of policy and findings reveal that Congress passed the Act to remedy intolerable employment conditions "through the exercise ... of its power to regulate commerce among the several States and with foreign nations." 29 U.S.C. § 202(b). Time and again, the Supreme Court has viewed FLSA as a manifestation of Congress' commerce power, although it has wavered on the Act's constitutionality as applied to public entities. *See Maryland v. Wirtz,* 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968) (validating FLSA's extension to public schools and hospitals under the commerce power); *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) (Tenth Amendment prohibits Congress from using commerce power to subject states to FLSA; overruling *Wirtz* ); *Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) (overruling *Usery* and holding that the Tenth Amendment does not restrict Congress' commerce power to extend FLSA to the states); *see also Wilson–Jones,* 99 F.3d at 207 ("Neither party disputes the obvious fact that the FLSA's wage and hour provisions were enacted pursuant to Congress' commerce power."). This presents a problem of great magnitude here because the Supreme Court recently held that Congress can no longer use the Commerce Clause to abrogate sovereign immunity. *Seminole,* —— U.S. at ——, 116 S.Ct. at 1132.

The precise holding in *Seminole* is that Congress may not abrogate state immunity by way of its powers under the Indian Commerce Clause. *Id.* at ——, 116 S.Ct. at 1126. But the Court proceeded to extend its holding to the whole of Article I, finding "no principled distinction" between the Indian and Interstate Commerce Clauses. *Id.* at —— – ——, 116 S.Ct. at 1127–32. *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), which

had ruled that the Interstate Commerce Clause is a valid source of abrogation power, was expressly overruled. *Id.* at ——, 116 S.Ct. at 1128. *Union Gas,* the Court explained, confounded the coercive power of abrogation with consensual waiver, and fundamentally misunderstood the constitutional principle that the Eleventh Amendment presents a jurisdictional obstacle that Congress cannot clear using Article I. *Id.* at —— ——, 116 S.Ct. at 1127–28. The upshot of *Seminole* is that Article I is no longer available to Congress as a means for abrogating state immunity. To the extent FLSA's abrogation provisions are premised on the commerce power, they are impotent. *See, e.g., Wilson–Jones,* 99 F.3d at 207; *Taylor,* 951 F.Supp. at 594 ("[A]ssuming ... that Congress acted only under the Commerce Clause in extending the FLSA wage, hour and overtime provisions to state employees, this action must be dismissed because the text of *Seminole* necessary to the result reached in that case requires a finding that the Commerce Clause does not authorize Congress to abrogate the States' constitutionally secured sovereign immunity."); *Biddlecome v. University of Texas,* 1997 WL 124220, at *5 (S.D.Tex. Mar.13, 1997); *Bergemann,* 958 F.Supp. at 67–68; *American Federation of State, County & Municipal Employees, AFL–CIO v. Virginia,* 949 F.Supp. 438, 441 (W.D.Va.1996) ("[A]bsent a waiver, the Eleventh Amendment bars this action if the Commerce Clause alone supports the FLSA."); *Raper v. Iowa,* 940 F.Supp. 1421, 1424 (S.D.Iowa 1996); *Rehberg v. Department of Public Safety,* 946 F.Supp. 741, 742 (S.D.Iowa 1996); *Close v. New York,* 1996 WL 481550, at *3 (N.D.N.Y. Aug.19, 1996); *Goebel v. Colorado,* No. 93–K–1227, slip op. at 9–10 (D.Colo. June 25, 1996).

■ *Seminole* nevertheless preserved a lone avenue of abrogation power—section 5 of the Fourteenth Amendment. *Seminole,* —— U.S. at ——, 116 S.Ct. at 1125. Unlike Article I, which constrains the federal government, the Fourteenth Amendment "expanded federal power at the expense of state autonomy." *Goebel,* slip op. at 7 (citing *Fitzpatrick v. Bitzer,* 427 U.S. 445, 455, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976)). As such, Congress may rely on it to enhance the reach of the federal judiciary. Seizing upon this limited exception, Digiore argues that the Fourteenth Amendment supports FLSA's enactment. He claims that the Act's legislative history divulges that the Equal Protection Clause "was expressly used as one of the reasons for applying FLSA to governmental employees." Pl. Resp. at 10. The cited legislative history consists of various excerpts from the Congressional Record during the time Congress was considering extending FLSA to the states, each emphasizing the injustice of treating employees in the private sector more favorably than their counterparts in the public sector. Digiore essentially contends that the Equal Protection Clause encompasses distinctions between public and private employees.

Several courts have faced this line of reasoning following *Seminole,* and every one has rejected it. Most notable is the Sixth Circuit's decision in *Wilson–Jones v. Caviness,* 99 F.3d 203, 205 (6th Cir.1996), concluding that the Fourteenth Amendment does not sustain FLSA's abrogation of state immunity. In *Wilson–Jones,* plaintiff employees of Ohio's Civil Rights Commission sued state officials alleging that the Commission violated FLSA's overtime provisions. *Id.* at 206. In response to the officials' claims of immunity and *Seminole's* prohibition of abrogation using Article I, plaintiffs argued that FLSA's extension to the states was additionally supported by the Fourteenth Amendment, even though the statute did not mention it as a source of power. The court acknowledged that Congress need not disclose the power source justifying a statutory enactment. *Id.* at 208. In addition, it observed that Congress is free to legislate to enforce the Equal Protection Clause if the statute: 1) may be regarded as an enactment to enforce the Clause; 2) is "plainly adapted to that end"; and 3) is consistent with "the letter and spirit of the constitution." *Id.* at 209 (quoting *Katzenbach v. Morgan,* 384 U.S. 641, 651, 86 S.Ct. 1717, 1723–24, 16 L.Ed.2d 828 (1966)) (internal quotations omitted). But the court found that FLSA does not even satisfy the first prong. *Id.* at 210. Absent the Clause's explicit identification as a source of power, "there must be something about the act con-

necting it to recognized Fourteenth Amendment aims," i.e., eradicating official discrimination on the basis of race or gender. *Id.* The court could discern no such connection:

Examining the FLSA itself, there is no sufficiently strong logical connection between the aim of the act—to increase the wages and shorten the hours of certain employees—and central, obvious Fourteenth Amendment concerns. The plaintiffs argue that the 1974 amendment to the FLSA extending jurisdiction to actions against states was motivated by a concern that state employees were receiving less pay than private sector employees, and cite a few instances in the legislative history suggesting a desire to end this "discrimination." However, such reasoning could support any Congressional action extending the scope of a law to cover a new class of people—thereby defeating the principle that Congress has but limited power.... We think it best to "regard as an enactment to enforce" the Equal Protection Clause, in the absence of explicit comment by Congress, only efforts to remedy discrimination against a class of persons that Fourteenth Amendment jurisprudence has already identified as deserving special protection. The FLSA does not fall within this special class of legislation....

*Id.* Lacking any basis for abrogating sovereign immunity, the FLSA's provisions subjecting states to suit in federal court for violating the Act's overtime and wage sections were deemed unconstitutional. *Id.* at 205.

We find this reasoning persuasive, as has every decision since *Wilson–Jones,* all of which concur with its analysis and finding that the Fourteenth Amendment cannot support FLSA's abrogation of sovereign immunity. *See Taylor,* 951 F.Supp. at 597–600 (finding nothing linking FLSA to the Equal Protection Clause, and performing a thorough examination of legislative history to conclude that "the improvement of labor conditions provided the impetus for the 1974 amendments, and the express object of Congress was to achieve this improvement in order to free interstate commerce, not to remedy disparate treatment."); *American*

*Federation,* 949 F.Supp. at 441 (holding plaintiffs' contention that FLSA's 1974 amendments were passed to remedy discrimination "amounts to an unwarranted expansion of the scope of Fourteenth Amendment jurisprudence to proscribe economic distinctions not related to race, sex or national origin."); *Rehberg v. Department of Public Safety,* 946 F.Supp. 741, 743 (S.D.Iowa 1996) (same); *see also Raper,* 940 F.Supp. at 1425 (*pre-Wilson-Jones* case determining that "there is no 'legislative purpose or factual predicate' which would have supported the FLSA's passage under the Fourteenth Amendment."); *Goebel,* slip op. at 11–12 (pre-*Wilson–Jones* case holding that FLSA's language, 1974 amendments, legislative history and historical context "fail to suggest the Congress acted pursuant to Section 5 of the Fourteenth Amendment.").

■■■■ In light of this copious, unanimous and well-reasoned authority, and in the absence of Seventh Circuit case law, we reject Digiore's suggestion that Congress, either explicitly or implicitly, through its legislative history or otherwise, premised the FLSA's abrogation provisions on the Equal Protection Clause. No court has interpreted the Clause to reach inequities in wage and overtime pay between private and public employees. Rather, the only source of power supporting FLSA's extension to the states is the Commerce Clause. And after *Seminole,* the commerce power is off-limits for abrogation. Therefore, we hold that Congress has been stripped of the ability to abrogate state immunity under FLSA. The only remaining question is whether the defendants have effected an Eleventh Amendment waiver.

## II. Waiver

■■■■ State immunity may be surrendered by waiver. But "the test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one." *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 241, 105 S.Ct. 3142, 3146, 87 L.Ed.2d 171 (1985). The state's consent must be "unequivocally expressed," *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 99, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984), "by the most express lan-

guage or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction." *Edelman,* 415 U.S. at 673, 94 S.Ct. at 1361 (internal quotations and citations omitted). There are two prevailing methods of waiving immunity: through a state statutory or constitutional provision specifically permitting suit against the state in federal court, or in the context of a federal program that "manifest[s] a clear intent" to condition funding on the State's consent to federal jurisdiction. *Atascadero,* 473 U.S. at 238 n. 1, 247, 105 S.Ct. at 3145 n. 1, 3149–50. Consent through *quid pro* quo participation in a federal program amounts to a "constructive waiver" of immunity. See *Charley's Taxi Radio Dispatch v. SIDA of Hawaii,* 810 F.2d 869, 873 (9th Cir.1987). Because "[c]onstructive consent is not a doctrine commonly associated with the surrender of constitutional rights," *Edelman,* 415 U.S. at 673, 94 S.Ct. at 1360, it is found only where the state, with full knowledge that it faces federal court liability, nonetheless chooses to engage in the activity regulated by the federal program. *See Atascadero,* 473 U.S. at 247, 105 S.Ct. at 3149–50; *Parden v. Terminal Ry.,* 377 U.S. 184, 191, 84 S.Ct. 1207, 1212, 12 L.Ed.2d 233 (1964). "The mere fact that a State participates in a program through which the Federal Government provides assistance," however, is insufficient to establish waiver. *Edelman,* 415 U.S. at 673, 94 S.Ct. at 1360–61; *see Atascadero,* 473 U.S. at 246–47, 105 S.Ct. at 3149–50 ("[T]he mere receipt of federal funds cannot establish that a State has consented to suit in federal court.").

Digiore points to two alleged indications of the state's waiver: 1) constructive waiver through "choosing" to engage in activities regulated by FLSA while simultaneously receiving federal money to comply with FLSA's dictates; and 2) express waiver by enacting the Illinois Minimum Wage Law, which provides that the state may be sued in "court." We address each argument in turn.

## A. The State Has Not Constructively Waived Its Immunity

First, Digiore presents a theory of constructive waiver based on two cases: the Supreme Court's decision in *Parden v. Terminal Ry.* and *Carey v. White,* 407 F.Supp. 121 (D.Del.1976). *Parden* held that Alabama waived its immunity to suit in federal court under the Federal Employers Liability Act by deciding to operate railroads after the statute's enactment:

> Our conclusion is simply that Alabama, when it began operation of an interstate railroad approximately 20 years after enactment of the FELA, necessarily consented to such suit as was authorized by that Act. By adopting a right of action against interstate railroads; by enacting the FELA in exercise of [the commerce] power, Congress conditioned the right to operate a railroad in interstate commerce upon amenability to suit in federal court as provided by the Act; by thereafter operating a railroad in interstate commerce, Alabama must be taken to have accepted that condition and thus to have consented to suit.

*Parden,* 377 U.S. at 192, 84 S.Ct. at 1213. Thus, knowing full well that the FELA subjected states operating railroads to suit in federal court; Alabama made the conscious choice to become involved in administering the railway system. Likewise, in *Carey,* the court held that the State's choice to manage psychiatric hospitals in the face of FLSA's clear language subjecting states to federal court jurisdiction effected a waiver of immunity. 407 F.Supp. at 124–25. It reasoned that, when Congress extended FLSA to the states in 1974, Delaware "had the choice of ceasing to engage in the federally regulated activity or of waiving [its] immunity to suits in federal courts." *Id.* at 125. Nonetheless, the state "chose to continue operating institutions for the mentally ill in light of this clearly articulated Congressional intent." *Id.*

Similarly, Digiore claims, the State of Illinois waived its immunity "when it chose to accept federal monies and comply with the FLSA," which plainly provides for suit in federal court. Pl. Resp. at 5. He alleges that the state has contracted with the federal government to furnish services under two federally funded programs—the Anti Drunk Driver Enforcement Project and the Speeding Traffic Accident Reduction program. Through these contractual programs, he and

the other plaintiffs allegedly receive time-and-a-half pay. Because the state accepts money from these programs, and FLSA requires employers providing contract services to comply with the FLSA, Digiore argues that the State has chosen to accept this financial benefit in exchange for submitting to federal court suit under FLSA § 216(a). This argument is flawed, for three reasons. First, as a matter of law, *Parden* and *Carey's* constructive waiver analysis is inconsistent with *Seminole's* holding that Congress cannot impose federal court jurisdiction on the states through the Commerce Clause. Second, as a matter of fact, operating a railroad is fundamentally distinct from employing police officers to ensure the safety of state highways—it is absurd to say the state has acted outside its sovereignty and moved into the arena of federal regulation in the latter situation. Finally, FLSA is not a voluntary spending program whose benefits the states may decide to accept or reject; its dictates apply irrespective of any contractual agreement with the federal government.

We begin by pointing out that *Parden's* holding that Alabama waived its immunity under FELA by operating a railroad rests heavily on Congress' commerce powers. *See Parden,* 377 U.S. at 192–93, 84 S.Ct. at 1212–14. However, because *Seminole* rejected congressional attempts to expand federal jurisdiction using the Commerce Clause, the continuing viability of *Parden* is extremely questionable:

> In overruling *Union Gas* today, we reconfirm that the background principle of state sovereign immunity embodied in the Eleventh Amendment is not so ephemeral as to dissipate when the subject of the suit is an area ... that is under the exclusive control of the Federal Government. Even when the Constitution vests in Congress complete lawmaking authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting states. The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction.

— U.S. at ——–——, .116 S.Ct. at 1131–32. This broad language compels the conclusion that the difference between constructive waiver and abrogation is purely semantic. What Congress is prohibited from doing by abrogation, it should not be permitted to accomplish through the back door of waiver. Justice Scalia said as much in his dissent in *Union Gas,* cited liberally and with approval in *Seminole:* "[T]o acknowledge that the Federal Government can make the waiver of state sovereign immunity a condition to the State's action in a field that Congress has authority to regulate is substantially the same as acknowledging that the Federal Government can eliminate state sovereignty in the exercise of its Article I powers—that is, to adopt the very principle I have just rejected." 491 U.S. at 44, 109 S.Ct. at 2304. Moreover, *Parden* was decided at a time when Congress was assumed to have the power unilaterally to abrogate state immunity, and, consequently, when there was no need to determine whether a state's activities amounted to waiver. *See Goebel,* slip op. at 19. Now, however, we must be much more vigilant in determining whether the state expressed "unequivocal consent" to suit in federal court. *See American Federation,* 949 F.Supp. at 442 (holding that, if *Parden's* reasoning were followed today, "Congress could, despite the Eleventh Amendment's prohibition [under *Seminole*], authorize a citizen to sue the Commonwealth in federal court simply because the Commonwealth engaged in commerce.").

When the constructive waiver doctrine is applied to activities that the state has but little choice to engage in, the waiver-abrogation distinction erodes even further. A state can hardly manifest consent to suit by "choosing" to perform an essential governmental function, such as policing. *Goebel,* slip op. at 19. Nor can the state waive immunity merely by hiring and paying its employees. Employment is something "in which all states were involved long before the FLSA was enacted and [which] remains an essential function of state government." *Close v. New York,* 1996 WL 481550, at *4 (N.D.N.Y. Aug.19, 1996). Under these circumstances, "the state has no realistic options and, thus, there is no practical dis-

tinction between constructive waiver and Congressional abrogation." *Goebel*, slip op. at 19. Likewise, simply allowing the federal government a hand in regulating some portion of state activity does not translate, by itself, into the state's consent to suit in federal court. *Id.; see Atascadero*, 473 U.S. at 246–47, 105 S.Ct. at 3149–50 ("[T]he mere receipt of federal funds cannot establish that a State has consented to suit in federal court."); *Edelman*, 415 U.S. at 673, 94 S.Ct. at 1360–61 ("The mere fact that a State participates in a program through which the Federal Government provides assistance" is insufficient grounds to find waiver).

If we were to find that Illinois waived its immunity in the overwhelmingly state-controlled activities of policing or employing state workers, or even by putting its employees to the task of implementing federal objectives under contracts with the United States, the zone of sovereign immunity would be completely eroded. Such a finding would also directly contradict *Atascadero* and *Edelman's* command that waiver cannot be manifested by mere participation in a federal scheme. And it would fly in the face of *Seminole's* tight restrictions on congressional power to eradicate immunity. In short, by requesting a ruling that the State waived its immunity by "choosing" to engage in policing, employing and providing federal contract services, Digiore asks this Court to ignore over a decade of Supreme Court precedent. This we are not empowered to do.

■■■ Finally, although Illinois may have agreed to provide the United States contractual services in exchange for federal funds, the State never "consented" to the application of FLSA or its mandatory provisions on federal court jurisdiction as part of the bargain. By virtue of the Act's 1974 amendments, the State must comply with FLSA regardless of any contractual agreement to do so. Because the State's "participation" in FLSA is involuntary, "the FLSA cannot provide the predicate for a constructive waiver of immunity by acceptance of federal funds." *Taylor*, 951 F.Supp. at 603. Furthermore, the Supreme Court has definitively held that an agreement to comply with federal law in conjunction with a federal program is insufficient to waive sovereign immunity. *Florida Dep't of Health & Rehabilitative Servs. v. Florida Nursing Home Ass'n*, 450 U.S. 147, 150, 101 S.Ct. 1032, 1034–35, 67 L.Ed.2d 132 (1981). In *Florida Department of Health*, the state agreed to "recognize and abide by all State and Federal Laws, Regulations, and Guidelines applicable to participation in and administration of" certain Medicaid programs. But, as the Court explained, "the fact that the [state] agreed explicitly to obey federal law in administering the program can hardly be deemed an express waiver of Eleventh Amendment immunity. This agreement merely stated a customary condition for any participation in a federal program." *Id.* at 150, 101 S.Ct. at 1034. Therefore, any contractual provisions similar to those in *Florida Department of Health* would not aid Digiore in his quest to overcome state immunity.

In sum, Digiore cannot prevail on a constructive waiver theory. Besides the foregoing obstacles, he must contend with the fact that "[c]onstructive consent is not a doctrine commonly associated with the surrender of constitutional rights." *Edelman*, 415 U.S. at 673, 94 S.Ct. at 1360. Indeed, one prominent scholar of federal jurisdiction has observed that

> constructive waiver of Eleventh Amendment immunity is virtually nonexistent. If it ever will exist, it will be in situations where Congress indicates a clear intent to make states liable in federal court if they engage in a particular activity, and then a state voluntarily chooses to engage in that conduct.

ERWIN CHEMERINSKY, FEDERAL JURISDICTION 410 (2d ed.). This narrow exception does not apply here, where the alleged waiver arises from activities intrinsic to state sovereignty and in operation long before FLSA was extended to the states.

## B. The State Has Not Expressly Waived Its Immunity

■■■ Digiore's second argument is that the state expressly waived federal court immunity by enacting its state minimum wage law, IMWL. In its *enforcement* provision, the Act provides that "[i]f any employee is paid

by his employer less than the wage to which he is entitled under the provisions of this Act, the employee may recover in a civil action the amount of any such underpayments together with costs and such reasonable attorneys' fees as may be allowed by *the Court* ...." 820 ILCS 105/12(a). The Act includes within the definition of "employer" a "governmental or quasi-governmental body." *Id.* § 3(c). Digiore contends that because the Act permits suit in court and explicitly applies to the state, the state has manifested consent to suit in federal court. In support of this position, he cites *Bankston v. Illinois*, No. 93 C 39, 1993 WL 141785 (N.D.Ill. Apr. 30, 1993)[2], an action alleging violations of both FLSA and IMWL, in which the court held that the Illinois statute's inclusion of the state within its scope was sufficient to waive immunity to suit in federal court. Slip op. at 5.

 We believe that *Bankston's* conclusion is seriously flawed. Supreme Court precedent is clear that consenting to suit in state court does not constitute a waiver of immunity to suit in federal court. *See Atascadero*, 473 U.S. at 241, 105 S.Ct. at 3146–47 ("Although a State's general waiver of sovereign immunity may subject it to suit in state court, it is not enough to waive the immunity guaranteed by the Eleventh Amendment."). This is because "a State's constitutional interest in immunity encompasses not merely whether it may be sued, but where it may be sued." *Pennhurst*, 465 U.S. at 99, 104 S.Ct. at 907. The Court in *Edelman* put it most succinctly:

> Respondent argues that the State of Illinois has abolished its common-law sovereign immunity in its state courts, and appears to argue that suit in a federal court against the State may thus be maintained. .... Whether Illinois permits such a suit to be brought against the State in its own courts is not determinative of whether Illinois has relinquished its Eleventh Amendment immunity from suit in the federal courts.

*Edelman*, 415 U.S. at 677 n. 19, 94 S.Ct. at 1363 n. 19. For any statute to waive federal court immunity, it must "specifically indicate the State's willingness to be sued in federal court." *Atascadero*, 473 U.S. at 234, 105 S.Ct. at 3143; *see Micomonaco v. Washington*, 45 F.3d 316, 319 (9th Cir.1995) (To constitute an express waiver, "the statute at issue must specify the state's intention to be sued in federal court."). The statute on which Digiore relies, however, is a state law that, while admittedly including the State within its purview, does not specifically reference suit in *federal* court. The phrase "the Court" is too imprecise to meet this standard. While the statute may indeed effect a general waiver of sovereign immunity in state court, it falls far short of "the most express language or ... such overwhelming implication from the text as leave[s] no room for any other reasonable construction" that is required for federal court waiver. *Edelman*, 415 U.S. at 673, 94 S.Ct. at 1360–61 (internal quotations and citations omitted).

 Accordingly, the state has not waived its Eleventh Amendment immunity through the IMWL. Nor has it effected a constructive waiver by participating in a federal program that clearly conditions funding on consent to suit in federal court. These two points, plus the fact that Congress has no power to abrogate the state's immunity in this case, lead to the conclusion that the State of Illinois is immune to this suit, which requests only retroactive relief prohibited by the Eleventh Amendment. We therefore dismiss the State as a defendant. We also dismiss defendants Ryan and Pecoraro in their official capacities because, as officials, they cannot serve as the source of any damage award. Rather, the State is the real party in interest. *See Wilson–Jones*, 99 F.3d at 211 ("That part of the action against the officers in their official capacity for money damages is also barred, as such an action is nothing but a suit to recover money damages from the state treasury. ").

2. This opinion denied the defendants' motion to dismiss. The case was subsequently tried before a jury, which found in favor of the plaintiffs. Ruling on a post-trial motion, the district court awarded the plaintiffs liquidated damages. The Seventh Circuit affirmed this ruling, in an opinion that we cite in connection with our analysis determining whether Digiore can maintain this action against Ryan and Pecoraro individually.

■ We emphasize that our conclusion does not amount to an invitation for states to violate FLSA willy-nilly. Although private plaintiffs cannot sue the state for damages, they may sue a state officer in federal court for an injunction ordering compliance with the Act. *Id.* In addition, the United States may sue the state for damages on behalf of state employees, sharing with them any damage award. *Id.* State employees may also look to state court as a forum for recovering money damages under FLSA. *Id.* Under the Supremacy Clause, the state court would have to enforce FLSA. *Id.* Finally, state employees may follow Digiore's lead in this case—suing state officials in their personal capacity for money damages. We explain this conclusion in the next section.

### III. The Eleventh Amendment Does Not Bar This Suit Against Ryan and Pecoraro Personally

■ Although private parties cannot recover damages from state officials in their official capacities, the Eleventh Amendment does not bar suits against state officials in their personal capacities for violations of federal constitutional or statutory law. *MSA Realty Corp. v. Illinois*, 990 F.2d 288, 291 (7th Cir.1993). The "threshold issue" for determining if the plaintiff has properly brought a personal-capacity suit is whether the complaint "clearly claim[s] against the defendant in his individual capacity." *Hardin v. Straub*, 954 F.2d 1193, 1199–1200 (6th Cir.1992). This requirement may be met by a simple statement to that effect in the complaint. *See id.* at 1200. The next task is to determine whom the suit really seeks to hold liable. *Id. In Kentucky v. Graham*, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), the Supreme Court explained that the test for distinguishing between personal capacity and official capacity suits is who pays:

> Personal capacity suits seek to impose personal liability upon a governmental official for actions he takes under color of state law. Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which the officer is an agent." ... Thus, while an award of damages against an official in his personal capacity can be exe-

cuted only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.

*Id.* at 165–66, 105 S.Ct. at 3105. "The general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter." *Pennhurst*, 465 U.S. at 101, 104 S.Ct. at 908. (citations and internal quotations omitted). The Court has therefore adopted a relief-oriented approach: if personal assets will satisfy the judgment, the state is not the real party in interest and the Eleventh Amendment permits suit against the individual; but if state funds will be tapped, the defendants are named only nominally as officials and immunity bars the suit.

■ We first note that Digiore fulfills the threshold requirement for personal-capacity suits, because the complaint, both in its caption and internally, specifies that Ryan and Pecoraro are being sued in their individual (as well as official) capacities. Our finding is strengthened by the fact that Digiore alleges that each defendant violated federal law through individual wrongdoing—responsibility in implementing and continuing the overtime and wage policies that violate FLSA. The *Kentucky v. Graham* decision observed that, in an official-capacity action, "death or replacement of the named official will result in automatic substitution of the official's successor in office." 473 U.S. at 166, 105 S.Ct. at 3105 (citing Fed.R.Civ.P. 25(d)(1); Fed. R.App. P. 43(c)(1)). Such would not be the case here because Digiore premises his claims on specific actions taken by defendants Ryan and Pecoraro; their successors, innocent of this alleged conduct, would not be substituted if Ryan or Pecoraro left office.

Looking next to the relief requested, we discern two types (which mirror FLSA's damages provisions in § 216), each of which could conceivably run against Ryan and Pecoraro personally. First, Digiore requests the Court to "order Defendants to pay Plaintiffs for all hours worked and their unpaid premium overtime compensation." Second, he asks for "an equal amount in liquidated

damages" plus costs and attorneys' fees. Neither prayer explicitly targets state funds. However, to the extent that the request to order wage payments would entail dipping into the State's pocket, it is void, because the State, not defendants Ryan and Pecoraro, would then be the real party in interest. But if this same amount, once determined, can be assessed against Ryan and Pecoraro, they remain viable defendants in their personal capacities. Likewise, the liquidated damages Digiore seeks are not limited to payments by the State. The complaint therefore does not require the Court to award damages from the state treasury. Because Digiore's burden is only to "allege facts from which jurisdiction may be inferred," *Bergemann v. Rhode Island,* 958 F.Supp. 61, 65–66 (D.R.I. 1997), his complaint need only support a reasonable reading of personal liability.

Of course, this analysis is based on an assumption that the statute permits individual liability—an assumption that is supported by the statute and cases construing it. As we noted above, Section 216(a) of FLSA allows a suit for damages against "any employer," and "employer" means "any person acting directly or indirectly in the interest of an employer in relation to an employee," 29 U.S.C. § 203(d). We find no distinction in this language between individuals and institutions. Nor have other courts, including this circuit. In *Bankston v. Illinois,* 60 F.3d 1249, 1255 (7th Cir.1995), the Seventh Circuit affirmed damage awards under FLSA against state officers in their individual capacities. And in *Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962 (6th Cir.1991), the Sixth Circuit held the president of a corporation liable for violating FLSA's overtime provisions because he maintained "operational control of significant aspects of the corporation's day-to-day functions," such as determining employee salaries. *Id.* at 966. It was sufficient that he was the "top man" at the corporation and it operated for his profit. *Id.* at 966. The court determined that this interpretation was consistent with FLSA's remedial purposes, which "require the courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications." *Id.* at 965; *see Falk v. Brennan,* 414 U.S. 190, 195, 94 S.Ct. 427,

431, 38 L.Ed.2d 406 (1973) (commenting on the "expansiveness of [FLSA]'s definition of 'employer'" and holding that defendant's control over the terms and conditions of plaintiffs' work rendered it an employer).

▮ All this is simply to say that FLSA does contemplate individual liability under the term "employer." We express no view as to whether Digiore states a substantive claim against Ryan and Pecoraro under FLSA, as defendants have not raised that issue. Rather, we hold only that the Eleventh Amendment does not bar FLSA claims against Ryan and Pecoraro personally because the statute does not limit liability to the state.

Defendants nonetheless assert that Digiore's claims against Ryan and Pecoraro in their personal capacities are in essence against the State, and, therefore, barred by the Eleventh Amendment. They offer three arguments in support of this position. First, defendants claim that *Seminole* extended state immunity to defendants in their personal capacities. Second, they argue that because *Kentucky v. Graham,* which sets forth the pocketbook test for distinguishing between individual- and personal-capacity suits, was a § 1983 case premised on Fourteenth Amendment violations, it is inapplicable to cases involving FLSA, which was enacted under the Commerce Clause. Because *Seminole* discredited the Commerce Clause as a source of congressional power to eradicate immunity, the defendants argue that *Graham* allegedly cannot be applied here to reach the individual defendants. Third, defendants maintain that "any award against the individual defendants in this case would be paid out of state funds." Def. Reply at 4. None of these arguments has merit.

First, the *Seminole* Court's act of dismissing the Governor of Florida as a defendant on Eleventh Amendment grounds was not based on any extension of state immunity to officials in their individual capacities. To begin with, the opinion contains no language to this effect, which one would expect to accompany such a radical extension of Eleventh Amendment doctrine. Furthermore, all indications are that the Governor was sued in

his official capacity, not personally. The Court was asked to retain jurisdiction over the Governor based on *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), which permits suits against officials in their official capacity for prospective injunctive relief. —— U.S. at ——, 116 S.Ct. at 1132. But the Court found that issuing an injunction under *Young* would interfere with the "carefully crafted and intricate remedial scheme" that Congress had fashioned for state violations of the Indian Gaming Regulatory Act. *Id.* The Court's emphasis on *Young*, which is not addressed to personal-capacity suits, and the Court's concern for exposing state officials to federal court injunctive powers—absent from individual-capacity suits, where the full range remedial sanctions is available—indicate that the rationale behind dismissing the Governor was his presence in the suit officially, not personally.

The fact that the Eleventh Amendment does not apply to personal capacity suits dooms defendants' second and third arguments as well. As an initial matter, defendants provide no support for their conclusory statement that "any award against the individual defendants in this case would be paid out of state funds." We found earlier that this is not necessarily the case. Secondly, the defendants' attempted distinction between the statutes in *Graham and Seminole* is untenable. The difference between congressional powers under the Commerce Clause and the Fourteenth Amendment is irrelevant when the Eleventh Amendment is not in play. Where, as here the suit (as circumscribed by this Court) contemplates only personal liability, and there is no danger of purging state funds, the doctrine of immunity—and Congress' power to abrogate or waive it—becomes inconsequential. Graham's analysis for determining whether a defendant is sued in his personal or official capacity therefore applies without regard to

the constitutional power Congress invoked when enacting the statute at issue.

Finally, the defendants cite four cases to bolster their argument that Eleventh Amendment immunity bars suit against Ryan and Pecoraro in their personal capacities. All are plainly inapposite. Two of the cases dismiss individual defendants based on state rules of immunity, and therefore have no bearing on immunity to federal court suits. *See Benning v. Board of Regents of Regency Univ.*, 928 F.2d 775, 779 (7th Cir.1991); *Healy v. Vaupel*, 133 Ill.2d 295, 311, 140 Ill.Dec. 368, 376, 549 N.E.2d 1240, 1248 (1990). The other two cases were brought as official-capacity suits, and thus do not speak to the issue of discerning between personal- and official-capacity actions. *See MSA Realty*, 990 F.2d at 290 ("MSA Corporation ... brought this suit against the State of Illinois and its principal executive officers in their official capacities...."); *Whitesell v. Moore*, No. 96 CV 292–BR2, slip op. at 1 (E.D.N.C. Aug. 13, 1996) ("[P]laintiff initiated the instant suit ... against the North Carolina Department of Crime Control and Public Safety, Division of State Highway Patrol; and Richard H. Moore, in his official capacity as the Secretary of the Department of Crime Control and Public Safety.").

In short, we conclude that none of defendants' arguments undermines our determination that Ryan and Pecoraro may be retained as defendants personally. The Eleventh Amendment does not prohibit it, and defendants raise no other grounds for the individual defendants' dismissal. Accordingly, we deny the defendants' motion to dismiss for lack of subject matter jurisdiction as it pertains to the defendants in their personal capacities.[3]

**CONCLUSION**

Defendants' Motion to Dismiss based on 12(b)(1) is granted in part and denied in part.

---

**3.** We will exercise pendent jurisdiction over Digiore's IMWL claim only as applied to Ryan and Pecoraro in their personal capacities. Because "pendent jurisdiction does not permit ... an evasion of the immunity guaranteed by the Eleventh Amendment," we cannot consider it against the State or against Ryan and Pecoraro as officials. *Pennhurst*, 465 U.S. at 121, 104 S.Ct. at

919. However, having decided that the Eleventh Amendment does not deprive us of jurisdiction over the FLSA claims brought against Ryan and Pecoraro individually, our jurisdiction "extend[s] to the determination of all questions of state law" brought against them in this capacity as well. *Id.* at 116–20, 104 S.Ct. at 917–18 (citations and internal quotations omitted).

It is granted as to the State of Illinois, which is dismissed as a party-defendant, and as to defendants Ryan and Pecoraro in their official capacities. It is denied as to all claims against Ryan and Pecoraro in their personal capacities. A status hearing will be held on April 15, 1997 at 9:00 a.m. in open court to address all issues that remain in this litigation.