990 F.2d 288
 MSA REALTY CORPORATION, Plaintiff-Appellant,
v.
STATE OF ILLINOIS; Jim Edgar, as Governor of the State of
Illinois; Douglas Whitley, as Director of the Department of
Revenue of the State of Illinois; Patrick Quinn, as
Treasurer of the State of Illinois; and Dawn Clark Netsch,
as Comptroller of the State of Illinois, Defendants-Appellees.
 No. 92-2922.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 9, 1992.
Decided March 29, 1993.
 
 1
 Kai A. Nebel, Mary B. Snyder, Darryl R. Davidson, Keck, Mahin & Cate, James H. Ryan, Horwood, Marcus & Braun, Chicago, IL (argued), for plaintiff-appellant.
 
 
 2
 Marita C. Sullivan, Louise M. Calvert, Mark E. Wilson, Officer of the Atty. Gen., Civil Appeals Div., Chicago, IL (argued), for defendants-appellees.
 
 
 3
 Before BAUER, Chief Judge, CUDAHY, Circuit Judge, and CRABB, District Judge.[1]
 
 
 4
 CRABB, District Judge.
 
 
 5
 In 1977, the State of Illinois enacted the Tax Increment Allocation Redevelopment Act, Ill.Rev.Stat. ch. 24, par. 11-74.4-1 et seq., to promote local redevelopment by enabling Illinois municipalities to create tax increment financing districts in statutorily qualified blighted or conservation areas within their boundaries and to use local real property tax increments resulting from the redevelopment to finance the redevelopment costs. In 1985, the state legislature amended the Act to include state sales tax increment revenues in the program. For municipalities electing to participate in TIF (Tax Increment Financing) districts, all of the state sales tax attributable to new retail sales generated in the TIF districts would be returned to the TIF districts, so long as the municipality deposited into a special Tax Increment Allocation Fund its entire real property and local 1% sales tax increments resulting from the redevelopment. Ill.Rev.Stat. ch. 24, par. 11-74.4-9. In response to this legislation, the Village of Buffalo Grove issued Tax Increment Revenue Bonds in June 1987, in the total principal amount of $8,500,000. Both the semi-annual interest payments and the principal payable at term on March 1, 1997 are payable only out of real property and state and local sales tax increments as defined in Ill.Rev.Stat. ch. 24, par. 11-74.4-1 et seq.
 
 
 6
 In 1988, the Illinois General Assembly amended the Act to reduce the sales tax increment that would be returned to participating municipalities. The original 5% state sales tax increment was reduced by an 80%-60%-40% formula. Ill.Rev.Stat. § 11-74.4-3(i). Thereafter, the governor and the director of the Department of Revenue budgeted less than the legislatively directed formula, so that in fiscal year 1992 the program-wide appropriation was only $18,000,000 instead of the full formula funding of $24,000,000. The governor's fiscal 1993 budget contains no funding for the state sales tax increment for qualified TIFs.
 
 
 7
 MSA Corporation, an Indiana corporation and holder of all of the June 1987 tax increment revenue bonds issued by the Village of Buffalo Grove, brought suit against the State of Illinois and its principal executive officers in their official capacities, contending that these defendants had impaired MSA's contract rights unconstitutionally when they reduced the state sales tax increment payable to eligible municipalities for the financing of local redevelopment projects. MSA sought as relief (1) a declaration that defendants have violated both the constitutional prohibition against impairment of contract and MSA's due process rights by their reductions in the return of the full 5% state sales tax increment and (2) an injunction requiring the state to return for fiscal year 1993 and thereafter the full 5% state sales tax increment to the Village of Buffalo Grove for use by the village to pay debt service on the bonds. When the district judge granted the state's and the officers' motion to dismiss and denied MSA's motion for reconsideration, MSA took an expedited appeal to this court.
 
 
 8
 In ruling on a motion to dismiss, a court may consider only the allegations of the complaint. In its complaint, MSA alleged that reliance on the state sales tax increment program in the issuance of bonds was foreseeable by the State of Illinois and was induced expressly by the legislation. It alleged also that after the bonds were issued, the executive branch of state government tried repeatedly to renege on the full state sales tax increment promised in the Act by seeking and obtaining a formula reduction in the 5% statutory entitlement, by failing and refusing to budget the amounts required by the legislation and by vetoing legislative efforts to appropriate funds to comply with the Act.
 
 OPINION
 
 9
 The threshold question is whether the district court had jurisdiction to entertain MSA's suit. The state and state officials contend that the answer is no, because the eleventh amendment bars suits in federal court against the states or against state officers who are sued for money damages in their official capacities, as these officers are. The district judge agreed that the eleventh amendment prevented MSA from suing the State of Illinois and dismissed the action against the state on this ground. He agreed also that the amendment prohibited federal actions against state officials for retrospective monetary relief, but he held that it did not preclude money damage claims against state officials in their official capacities that are limited to prospective injunctive relief "even where 'a substantial ancillary effect on the state treasury' accompanies the relief sought." MSA Realty Corp. v. Illinois, 794 F.Supp. 267, 271-72 (N.D.Ill.1992). He then considered whether MSA had stated a viable claim under the contracts clause of the Constitution and concluded it had not. First, MSA had not shown that the village lacked the ability to pay interest or principal on the bonds and second, MSA had not shown that it had any contractual right to the 5% sales tax increment, since the bonds themselves provided that they were issued pursuant to the Act "and all laws amendatory and supplemental thereof."
 
 
 10
 On this appeal, MSA does not contest the district court's rulings that the state cannot be sued (although it has retained the state as a defendant in the caption of its appeal) and that retrospective monetary damages are unavailable. We conclude that the eleventh amendment bars all aspects of the suit, making it unnecessary to reach any of the other arguments addressed by the district court and urged by the parties.
 
 
 11
 Determining the scope and coverage of the eleventh amendment is often difficult, although the amendment itself appears straightforward. It provides that
 
 
 12
 The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
 
 
 13
 The amendment makes no mention of sovereign immunity. Indeed, some scholars believe it was never intended to incorporate the concept but was intended only to deny that the identity of the parties could serve as a basis of jurisdiction when a state was sued by a noncitizen or alien, "or stated differently, whether the eleventh amendment did no more than partially repeal the provisions of article III, § 2, that 'the judicial Power shall extend' ... to Controversies ... between a state and Citizens of another State ... and between a State ... and foreign States, Citizens, or Subjects." David L. Shapiro, Comment, Wrong Turns: The Eleventh Amendment and the Pennhurst Case, 98 Harv.L.Rev. 61, 67 n. 37 (1984). See also William A. Fletcher, A Historical Interpretation of the Eleventh Amendment: A Narrow Construction of an Affirmative Grant of Jurisdiction Rather than a Prohibition Against Jurisdiction, 35 Stan.L.Rev. 1033 (1983); John J. Gibbons, The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation, 83 Colum.L.Rev. 1889 (1983); John V. Orth, The Interpretation of the Eleventh Amendment, 1798-1908: A Case Study of Judicial Power, 1983 U.Ill.L.Rev. 423. These writers and others question whether sovereign immunity was thought of as a constitutional limitation of federal judicial power in the late 18th or early 19th centuries. However, the Supreme Court has said definitively that the eleventh amendment affirms "the fundamental principle of sovereign immunity [that] limits the grant of judicial authority in Art. III" of the Constitution. Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 98, 104 S.Ct. 900, 906, 79 L.Ed.2d 67 (1984).
 
 
 14
 Under the prevailing view of the amendment, a state cannot be sued in federal court for monetary damages or equitable relief. Pennhurst, 465 U.S. at 100, 104 S.Ct. at 907 (jurisdictional bar of eleventh amendment applies "regardless of the nature of the relief sought"); Alabama v. Pugh, 438 U.S. 781, 782, 98 S.Ct. 3057, 3057, 57 L.Ed.2d 1114 (1978) (per curiam). This rule has two exceptions: a state may waive the protections of the amendment and consent to suit in federal court, or Congress may use its enforcement powers under the fourteenth amendment to abrogate the states' eleventh amendment immunity. For either exception to apply, the intent to waive or abrogate immunity must be explicit and unequivocal. Kroll v. Board of Trustees of University of Illinois, 934 F.2d 904, 907 (7th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 377, 116 L.Ed.2d 329 (1991).
 
 
 15
 The eleventh amendment bar extends to suits for money damages against state officials sued in their official capacities, because "a judgment against a public official 'in his official capacity' imposes liability on the entity that he represents...." Brandon v. Holt, 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). See Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945) (suit against the Indiana Department of Treasury and the members of the Board of the Department for refund of state taxes was barred by eleventh amendment because suit was in essence one for recovery of money from state, making state the real party in interest entitled to invoke its sovereign immunity from suit). However, the federal courts may exercise jurisdiction over suits alleging violations of federal constitutional or statutory law that are brought against state officials in their personal capacities. Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The states' immunity from federal suit does not extend to their officials sued for violations of federal law; illegal actions by state officials are not the acts of the state and do not share in its immunity. The state official who acts in violation of the federal Constitution is "stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct." Id. at 159-60, 28 S.Ct. at 454. Under Young, state officials may be sued in their official capacities for injunctive relief, although they may not be sued for money damages. Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 n. 10, 109 S.Ct. 2304, 2311 n. 10, 105 L.Ed.2d 45 (1989); Kentucky v. Graham, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985).
 
 
 16
 When a state official is sued in his personal capacity, ordinarily a successful plaintiff can obtain damages only from the defendant official's personal assets. Kroll, 934 F.2d at 907 (citing Kentucky v. Graham, 73 U.S. at 165-66, 105 S.Ct. at 3104-05). In certain instances, however, where the Supreme Court has deemed it necessary to vindicate the authority of the court or to ensure future compliance with a determination of a substantive federal question, the Court has affirmed awards against an individual state official sued in his personal capacity that are made payable out of state funds. See, e.g., Hutto v. Finney, 437 U.S. 678, 691, 98 S.Ct. 2565, 2573, 57 L.Ed.2d 522 (1978) (approving award of attorneys' fees against state officials in civil rights action and directing that award be paid out of state funds, as "ancillary to the federal court's power to impose injunctive relief"); Milliken v. Bradley, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (upholding district court's remedial plan for desegregation of Detroit school system that required State of Michigan to shoulder half the cost of the comprehensive program set out in the plan). The Court has never approved an order against a state official that would have the effect of requiring a state to make retroactive payments, even to correct a past constitutional wrong. Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (reversing order requiring State of Illinois to remit certain welfare benefits that had been withheld wrongfully).
 
 
 17
 Against this background of eleventh amendment law, a few precepts are plain enough. MSA is barred from proceeding directly against the State of Illinois since it does not contend that Illinois has waived its immunity to suit in federal court or that Congress has acted to abrogate that immunity in suits such as this. (The lack of waiver distinguishes this case from United States Trust Co. v. New Jersey, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977), a case on which MSA places great reliance. The Supreme Court had no occasion to address the question of eleventh amendment immunity in the case. The case came to the Court from the state courts of New Jersey, where the issue would never have been relevant. Moreover, it appears from a later decision involving the same port authority that New Jersey had waived its immunity to suit by adopting a consent to suit statute. See Port Authority Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990).)
 
 
 18
 With respect to its claims against the state officials, MSA agrees that it is barred from obtaining relief from these defendants in the form of retrospective damages for any allegedly wrongful actions they took in the past because they are sued only in their official capacities. MSA casts its request for relief as prospective only: seeking to have the state officials cease their unconstitutional interference with MSA's contract with the Village of Buffalo Grove by returning this year and in the future the full 5% state sales tax increment to the village for payment of debt service on the bonds held by MSA. MSA argues that the eleventh amendment does not prevent it from suing the defendant state officials for injunctive relief under Will, 491 U.S. 58, 109 S.Ct. 2304, even if the injunctive relief would have an effect on the state treasury, because the effect is only ancillary to the remedying of an ongoing constitutional wrong as was the case in Milliken, 433 U.S. 267, 97 S.Ct. 2749, and Hutto, 437 U.S. 678, 98 S.Ct. 2565, and thus is not the kind of required payment found improper in Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 65 S.Ct. 347.
 
 
 19
 MSA's argument has some superficial appeal. Its contention is that it is continuing to suffer the ongoing harm of a present violation of federal law and that in such instances the appellate courts have upheld lower court orders to bring about an end to such harm even when they may have a substantial ancillary effect on the state treasury. See, e.g., Papasan v. Allain, 478 U.S. 265, 278, 106 S.Ct. 2932, 2940, 92 L.Ed.2d 209 (1986) (citing Milliken, 433 U.S. at 289-90, 97 S.Ct. at 2761-62) and Edelman, 415 U.S. at 667-68, 94 S.Ct. at 1357-58). Closer scrutiny shows that MSA's claim is wholly unlike those approved in Papasan, Milliken and Hutto. MSA can obtain the relief it wants only through an order directing the payment of certain funds out of the state treasury to the Buffalo Grove TIF district for the ultimate benefit of MSA. This is different from the relief sought in Ford Motor Co. only to the extent that MSA is seeking recovery of money in the future. Like MSA, the plaintiff in Ford Motor Co. raised constitutional issues: it contended that the taxes Indiana had extracted from it were imposed in violation of both the commerce clause and the fourteenth amendment of the United States Constitution. In holding the suit against the members of the board of Indiana's treasury department barred by the eleventh amendment, the Supreme Court stated that whether the nature of a suit "is one against the state is to be determined by the essential nature and effect of the proceeding. And when the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit...." Id. 323 U.S. at 464, 65 S.Ct. at 350 (citations omitted).
 
 
 20
 As in Ford Motor Co., MSA's request for relief would have an effect upon the state treasury that is not merely ancillary but is the essence of the relief sought. Repeatedly, the Supreme Court has approved orders requiring the states to make payments or fund certain programs only as a means of vindicating federal constitutional rights and only after determining that substantive violations have taken place. The Court has never approved an award that would require payment from a state's treasury except "as a necessary consequence of compliance with a substantive federal-question determination." Edelman, 415 U.S. at 668, 94 S.Ct. at 1358. See also Papasan v. Allain, 478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (if plaintiffs can prove an ongoing violation of the equal protection clause they may be entitled to an remedy requiring the expenditure of state funds to eliminate the disparity). See discussion in James M. Hirschhorn, Where the Money Is: Remedies to Finance Compliance with Strict Structural Injunctions, 82 Mich.L.Rev. 1815, 1863-66 (1984) (suggesting that Quern v. Jordan, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), and Pennhurst State School & Hospital v. Halderman, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), advance the idea that the structural injunctions the Supreme Court has approved leave the states the option of ceasing to provide a particular program if they choose not to meet federal legal requirements for engaging in that activity).
 
 
 21
 Even if the remedy MSA seeks could be viewed as ancillary to the remedying of a substantive constitutional wrong, MSA faces another hurdle to its request for an order requiring the state, through its officials, to direct state revenues to a particular purpose for the benefit of a specific class: the holders of Tax Increment Revenue Bonds issued by the Village of Buffalo Grove in June 1987 pursuant to the Tax Increment Allocation redevelopment Act, as amended in 1985. The Supreme Court has never approved an order requiring a state to provide monetary relief to specific plaintiffs. Pennhurst State School & Hospital v. Halderman, 451 U.S. 1, 29, 101 S.Ct. 1531, 1546, 67 L.Ed.2d 694 (1981) ("In no case, however, have we required a state to provide money to plaintiffs, much less required a State to take on such open-ended and potentially burdensome obligations" as the structural relief sought by plaintiffs in this case). In Edelman, for example, in denying an award of wrongfully withheld benefits, the Court noted the fact that any payment would be made to a plaintiff class, 415 U.S. at 668, 94 S.Ct. at 1358; in Milliken, in affirming an injunction requiring the state to pay for specific school programs, the Court emphasized that none of the money spent for remedying past discrimination would go to any particular plaintiff. "In contrast to [the court of appeals' decision in Edelman that the Supreme Court reversed] there was no money award here in favor of respondent Bradley or any members of his class." 433 U.S. at 290 n. 22, 97 S.Ct. at 2762 n. 22.
 
 
 22
 Although MSA alleges interference by the named state officials with its private contract with the Village of Buffalo Grove; what it seeks in actuality is the performance of the state's alleged promise to the financing districts that induced MSA to enter into the contract with the Village of Buffalo Grove: payment of the full amount of the state sales tax increment specified in the Tax Increment Allocation Redevelopment Act. Even after Ex parte Young was decided in 1908, the Supreme Court has never approved a lower court order requiring officials of a state to take actions that constitute performance by a state of obligations that are the state's in its political capacity.
 
 
 23
 Efforts similar to MSA's by holders of publicly-issued bonds have met with uniform disapproval by the United States Supreme Court. In a series of cases brought between 1883 and 1890, in the aftermath of the Civil War, the Court held that neither states nor their officers may be sued in federal court to enforce payment of state-issued bonds. The bar extends to suits by the state's own citizens, Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), other states, New Hampshire v. Louisiana, 108 U.S. 76, 2 S.Ct. 176, 27 L.Ed. 656 (1883), and even foreign countries, Principality of Monaco v. Mississippi, 292 U.S. 313, 54 S.Ct. 745, 78 L.Ed. 1282 (1934).
 
 
 24
 Although the nineteenth century bond cases arose over acts taken by the southern states to dishonor bonds they themselves had issued before, during or immediately after the Civil War, the reasons for barring such suits apply equally to state-backed bonds such as the ones at issue here. In Louisiana v. Jumel, 107 U.S. 711, 2 S.Ct. 128, 27 L.Ed. 448 (1883), for example, the Supreme Court held that the eleventh amendment barred the federal court from taking jurisdiction over a mandamus action to require the members of the Louisiana Board of Liquidation to pay the originally-stated rate of interest on outstanding state bonds after the Louisiana government had amended the state's constitution to reduce the interest rate on the bonds and to limit the total state property tax used for payment of the interest. The Court acknowledged that the state had entered into contracts that were protected by the United States Constitution against impairment and noted that the parties were not seeking payment on the bonds but were asking the Court only to compel the state to perform its contracts. Nonetheless, the Court concluded, the amendment protected the states from suits that would have the federal courts assume "the control of the administration of the fiscal affairs of the State to the extent that may be necessary to accomplish the end in view." Id. at 721-22, 2 S.Ct. at 136. See also In re Ayers, 123 U.S. 443, 8 S.Ct. 164, 31 L.Ed. 216 (1887) (federal courts lack jurisdiction to hear bondholders' request for restraining order against attorney general because suit is actually one to force state to accept bond coupons on the terms on which they were issued; in effect, it was suit against the state treasury for specific performance barred by the eleventh amendment); Hagood v. Southern, 117 U.S. 52, 6 S.Ct. 608, 29 L.Ed. 805 (1886) (eleventh amendment prevented federal courts from hearing claims against state official brought by holders of state-issued bonds because relief sought was performance by the state officers of obligation that attached to state in its political capacity).
 
 
 25
 The essential holding of the bond cases has never been repudiated, although circumstances have changed significantly since the reconstruction era. It remains the case that federal courts cannot make the state perform an alleged contract or pay out money as damages, except in the few cases in which state officials or employees acting in their individual capacities have been found to have violated the constitutional rights of the plaintiffs and then only as necessary to ensure future compliance with a substantive federal question determination. When the Supreme Court decided Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, it distinguished both Hagood, 117 U.S. 52, 6 S.Ct. 608, and Ayers, 123 U.S. 443, 8 S.Ct. 164, in holding that in Young the plaintiff stockholders of various railroads could sue to enjoin the Attorney General of Minnesota from enforcing a state statute imposing maximum rates for passengers and freight that plaintiffs contended were so low as to deprive them and the railroad companies of property without due process of law. According to the Court, the difference between Young and the two older cases was that in Young, the plaintiffs were seeking to keep the Attorney General from acting, whereas in the older cases, the plaintiffs wanted the state itself to perform an alleged contract.
 
 
 26
 [A]lthough the State was not in name made a party defendant, yet being the actual party to the alleged contract the performance of which was sought and the only party by whom it could be performed, the State was, in effect, a party to the suit, and it could not be maintained for that reason. The things required to be done by the actual defendants were the very things that when done would constitute a performance of the alleged contract by the State.
 
 
 27
 Young, 209 U.S. at 151, 28 S.Ct. at 450. In Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662, the Court referred again to Hagood and Ayers, citing the two cases for the proposition that merely labeling relief sought as injunctive does not defeat the eleventh amendment bar to suits that seek relief from the state treasury. Not every "form of relief may be awarded against a state officer ... so long as the relief may be labeled equitable in nature." Edelman, 415 U.S. at 668, 94 S.Ct. at 1358.
 
 
 28
 The bond cases are consistent with the Supreme Court's general resistance to interference with a state's internal governance and administration. Forcing a state to perform a contract, in this case involving the collection of taxes and allocation of funds to a specific purpose, would insert the federal courts into the management of the state's fiscal affairs, a proposition rejected by the Court in Louisiana v. Jumel, 107 U.S. 711, 2 S.Ct. 128. With the notable exception of Milliken, 433 U.S. 267, 97 S.Ct. 2749, the Court has avoided remedies that bind a state to specific expenditures for specific purposes. Even in Milliken, the remedy would not have benefited the plaintiffs specifically: it was designed to benefit pupils in the Detroit public schools, a category that might or might not include the plaintiffs.
 
 
 29
 In sum, we conclude that the eleventh amendment bars a claim for injunctive relief such as MSA's that would require direct payments by the state from its treasury for the indirect benefit of a specific entity, or that seeks to require state officials to carry out a task that only the state can perform in its political capacity, such as fulfilling promises made allegedly to TIF districts such as the Village of Buffalo Grove, or that seeks relief that cannot be considered merely ancillary to achieving compliance with a determination of a substantive federal constitutional wrong.
 
 
 30
 The eleventh amendment bars MSA's request for declaratory relief as well. For the federal court to declare that defendants have violated the impairment of contracts clause in the past would give MSA a judgment that would have res judicata effect in state court on the issue of liability. Such relief should be denied when it " 'would have much the same effect as a full-fledged award of damages or restitution by the federal court, the latter kinds of relief being of course prohibited by the Eleventh Amendment,' " Green v. Mansour, 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985) (quoted in Benning v. Board of Regents of Regency Universities, 928 F.2d 775, 778 (7th Cir.1991)). See also Watkins v. Blinzinger, 789 F.2d 474, 483-84 (7th Cir.1986), cert. denied, 481 U.S. 1038, 107 S.Ct. 1976, 95 L.Ed.2d 816 (1987). This case differs slightly from Green as well as from Benning and Watkins in that it seeks relief from what MSA alleges is a continuing violation of constitutional law, rather than a past violation that has ceased. That difference does not relieve it from the force of the holding in Green, however. The point of Green is that declaratory relief should not be awarded where the eleventh amendment bars an award of monetary and injunctive relief; otherwise, the relief would operate as a means of avoiding the amendment's bar.
 
 
 31
 The decision of the district court granting defendants' motion to dismiss the complaint against them is
 
 
 32
 AFFIRMED.
 
 
 
 [1]
 The Honorable Barbara B. Crabb, Chief Judge of the Western District of Wisconsin, is sitting by designation