In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-3111

COUNCIL 31 OF THE AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO,

*Plaintiff-Appellant,*

*v.*

PAT QUINN, Governor of the State of Illinois, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 11-CV-03203—**Sue E. Myerscough**, *Judge.*

ARGUED FEBRUARY 24, 2012—DECIDED MAY 17, 2012

Before MANION and ROVNER, *Circuit Judges,* and
COLEMAN, *District Judge.**

MANION, *Circuit Judge.* The State of Illinois, facing a
"significant and unprecedented fiscal deficit," has brokered

* Hon. Sharon Johnson Coleman, of the Northern District of
Illinois, sitting by designation.

a series of compensation agreements with Council 31 of the American Federation of State, County, and Municipal Employees, AFL-CIO, the exclusive bargaining representative for 40,000 state employees. In the agreements, the parties trimmed several hundred million dollars in fiscal years 2011 and 2012 by deferring employees' general wage increases and instituting a voluntary furlough program. Despite these cost-saving measures, the fiscal year 2012 budget did not contain sufficient appropriations for the deferred wage increases that were due to employees of 14 state agencies. Accordingly, the State instituted a pay freeze for those employees, thereby repudiating the agreements that the parties had previously reached. Council 31 then brought this suit on behalf of itself and the affected employees, alleging that the State's actions violated the Contracts Clause and the Equal Protection Clause of the U.S. Constitution, and resulted in several violations of state law. Council 31 sought a preliminary injunction that would order the State to pay the wage increases as they came due, and the State filed a motion to dismiss all claims. The district court denied Council 31's motion for a preliminary injunction and granted the State's motion to dismiss. Council 31 has appealed and we now affirm.

**I.**

Council 31 is the longtime exclusive bargaining representative for more than 40,000 Illinois state employees in approximately 51 different departments and agencies. Council 31's latest series of collective bargaining agree-

ments with the State began on September 5, 2008, and runs through June 20, 2012. The collective bargaining agreements laid out the wages for affected employees in the form of base pay rates, annual increases, step increases, and longevity increases. The agreements also contained a general wage increase schedule that set a 1.5% increase effective January 1, 2009, a 2.5% increase effective July 1, 2009, a 2% increase effective January 1, 2010, a 2% increase effective July 1, 2010, a 2% increase effective January 1, 2011, a 4% increase effective July 1, 2011, and a 1.25% increase effective January 1, 2012.[1]

Facing the prospect of serious budgetary shortfalls for fiscal years 2011 and 2012, representatives of the State and Council 31 met in January 2010 to discuss potential cost-saving measures. The parties produced a mediated resolution which, in relevant part, limited the number of layoffs the State could make in fiscal year 2011 in exchange for a deferral of the general wage increases due to the employees. Specifically, the parties agreed to defer one-half of the 2% general wage increase due to employees on July 1, 2010 to June 1, 2011, and also one-half of the 2% general wage increase due on January 1, 2011 to June 1, 2011. This resolution saved the State more than $300 million in fiscal year 2011.

The parties met again in the fall of 2010 to resolve concerns about the impending budgetary shortfalls for

---

[1] The State's fiscal year runs from July 1 to June 30 each year. Thus, the wage increases were scheduled to occur twice a year throughout the life of the collective bargaining agreements.

fiscal year 2012. That meeting resulted in a cost-savings agreement that specified a goal of $100 million in total savings; the parties identified $50 million in cost-savings measures and promised to continue to seek further compromises that would save an additional $50 million. The biggest cost-savings measure laid out in the agreement was the deferral of half of the 4% general wage increase due to employees on July 1, 2011 to February 1, 2012. In exchange, the State agreed not to lay off any employees or close any facilities during fiscal year 2012.

After this agreement, Governor Pat Quinn submitted a proposed budget for fiscal year 2012 to the State General Assembly that "sought to fully fund all collective bargaining contracts." The budget that passed the General Assembly, however, was markedly different: that version of the budget did not contain the necessary appropriation authority to implement the annual general wage increases, step increases, and longevity increases due under the collective bargaining agreements to the employees of 14 state agencies.[2] After cutting an additional $376 million from the budget by line-item veto,

---

[2] Those agencies were the Criminal Justice Information Authority, the Department of Corrections, the Deaf and Hard of Hearing Commission, the Guardianship and Advocacy Commission, the Historic Preservation Commission, the Human Rights Commission, the Department of Human Rights, the Department of Human Services, the Department of Juvenile Justice, the Department of Labor, the Department of Natural Resources, the Prisoner Review Board, the Department of Public Health, and the Department of Revenue.

Governor Quinn approved a total budget of $33 billion on June 30, 2011. Notably, Governor Quinn's cuts made via line-item veto did not affect any appropriations for the employees' pay increases; rather, the budget passed by the General Assembly lacked the necessary appropriations for the pay increases. A memorandum from the State's Department of Central Management Services Director Malcolm Weems that was issued on July 1, 2011, the day after the budget became law, emphasized that the funding shortfall was caused by the legislature, not the Governor: "[T]he budget that was passed by the General Assembly and sent to the Governor DOES NOT contain appropriation authority to implement cost of living adjustments, longevity enhancements or step increases for employees covered by a collective bargaining agreement in the [14 affected agencies]."

In the same July 1 memorandum, Director Weems relayed the bad news that the State was instituting a pay freeze on the employees of the 14 agencies: "[D]ue to the absence of sufficient appropriations by the General Assembly, the above listed agencies cannot implement the FY12 increases." This directive was subsequently enacted in a set of Emergency Rules that amended the State's pay plan. 35 Ill. Reg. 11,657 (July 15, 2011). Those Emergency Rules were later made permanent and took effect on December 6, 2011. 35 Ill. Reg. 20,144 (Dec. 23, 2011). (Because there is no substantive difference between the Emergency and Permanent Rules, we will simply refer to them as the "Rules.")

The pay freeze affected approximately 30,000 Council 31-represented employees across the 14 agencies

and saved the State about $75 million. Council 31 argued that there were several viable alternatives that the State could have pursued to make up the lack of appropriations for the 14 agencies. Those alternatives included allocating some of the "hundreds of millions of dollars" in unexpended appropriations from fiscal year 2011, slowing the rate at which the State fills positions that become vacant during fiscal year 2012 or even instituting a hiring freeze on such positions, transferring funds from other appropriations items for the affected agencies, seeking legislative authority to use some of the savings from the governor's line-item vetoes, and seeking supplemental appropriations from the General Assembly.

But the State did not pursue any of those alternatives. So, on July 8, 2011, Council 31, on behalf of itself and its affected members, filed this suit against the State, Governor Quinn, and Director Weems. Less than two weeks later, Council 31 filed an amended complaint that listed five claims. Counts I and II, brought under 42 U.S.C. § 1983, alleged that Governor Quinn and Director Weems violated the Contracts Clause and Equal Protection Clause of the U.S. Constitution, and Counts III, IV, and V alleged state statutory and constitutional claims.

On August 9, 2011, the defendants moved to dismiss this suit for failure to state a claim as well as under the Eleventh Amendment's sovereign immunity protection. On August 19, 2011, Council 31 filed a motion for a preliminary injunction to enforce its Contracts-Clause

claim by enjoining the Rules and thus requiring the State to pay out wage increases as they came due. After supplemental briefing and an evidentiary hearing, the district court granted the defendants' motion to dismiss all claims and denied Council 31's request for preliminary injunctive relief. Specifically, the district court noted that the Eleventh Amendment barred Council 31's state-law claims against all defendants, and that Council 31 could not bring its § 1983 claims against the State; rather, such claims could be asserted only against Governor Quinn and Director Weems in their official capacities. The district court further held that the Eleventh Amendment barred Council 31's Contracts-Clause claim against Governor Quinn and Director Weems and, additionally, that the amended complaint failed to adequately state either a Contracts-Clause claim or an Equal Protection claim.

At the same time that this suit was unfolding, the parties engaged in arbitration. On July 19, 2011, the arbitrator found that the pay freeze violated the terms of the collective bargaining agreements and ordered the State immediately to pay the 2% wage increase that was due on July 1, 2011 (recall, the collective bargaining agreement originally provided for a 4% increase, but the parties had negotiated a deferral of half of that amount to a later date). The arbitrator further ordered the State to continue to pay the increased wages, and to make whole those employees who did not receive the increased wages due on July 1. The State then filed suit in the Circuit Court of Cook County to vacate the arbitrator's award; Council 31 counterclaimed for

enforcement of the award. *State v. Am. Fed'n of State & Mun. Emps., Council 31*, No. 2011-CH-25352 (Cook Cnty. Cir. Ct., Chancery Div. Mar. 15, 2012) (http://www.cookcountyclerkofcourt.org).[3] This state-court case remains pending during Council 31's present appeal taken from the district court.

## II.

The two claims at issue on appeal are Council 31's Contracts-Clause claim and its Equal Protection claim; both are asserted against Governor Quinn and Director Weems in their official capacities. Council 31 challenges the district court's holding that the Eleventh Amendment barred Council 31's Contracts-Clause claim against Governor Quinn and Director Weems and that the amended complaint failed to state either a Contracts-Clause claim or an Equal Protection claim. In making these arguments, Council 31 maintains that it is not seeking monetary damages in this case; rather, it is seeking injunctive relief on its Contracts-Clause claim and declaratory judgment on both of its claims. We will address the Eleventh Amendment issue first and then move to whether the district court properly dismissed

---

[3] There are two more actions also pending in Illinois state court. Those actions—one brought by the State, one by Council 31—involve the State's planned layoffs and facility closures. But on this appeal Council 31's federal challenges extend only to the pay-freeze issue, and thus neither of these state-court actions has any bearing on our case.

Council 31's claims for failure to state a claim on which relief may be granted.

## A. Eleventh Amendment Sovereign Immunity

The district court held that the Eleventh Amendment barred Council 31 from obtaining relief under its Contracts-Clause claim and accordingly denied Council 31's motion for a preliminary injunction. We review de novo a district court's dismissal of a plaintiff's claim on Eleventh Amendment grounds. *Nanda v. Bd. of Trustees*, 303 F.3d 817, 821 (7th Cir. 2002) (citation omitted).

The Eleventh Amendment provides, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend XI. Courts have construed this provision broadly, holding that it confers " 'the sovereign immunity that the States possessed before entering the Union.' " *Bd. of Regents v. Phoenix Int'l Software, Inc.*, 653 F.3d 448, 457 (7th Cir. 2011) (quoting *College Sav. Bank v. Fl. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 669 (1999)). This means that, although not explicitly provided for in the text, "the Eleventh Amendment guarantees that an 'unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State.' " *Id.* (quoting *Edelman v. Jordan*, 415 U.S. 651, 663 (1974)). As we have noted elsewhere, "[i]f properly raised, the amendment bars actions in federal court against a state, state

agencies, or state officials acting in their official capacities." *Ind. Prot. & Advocacy Servs. v. Ind. Family & Soc. Servs. Admin.*, 603 F.3d 365, 370 (7th Cir. 2010) (citing *Edelman*, 415 U.S. at 663). Here, there is no dispute that the defendants, sued as state officials acting in their official capacities, timely raised the Eleventh Amendment defense.

But, even when properly raised, sovereign immunity is not absolute immunity. There are three exceptions to this defense that may subject a state to an action in federal court: (1) where Congress, acting under its constitutional authority conveyed by amendments passed after the Eleventh Amendment (the most common being the Fourteenth Amendment), abrogates a state's immunity from suit; (2) where the state itself consents to being sued in federal court; and (3) under the doctrine articulated by the Supreme Court in *Ex parte Young*, 209 U.S. 123 (1908). *Id.* at 371. Here, the first two exceptions are not applicable so we need address only the third exception—the *Ex parte Young* doctrine.

The *Ex parte Young* doctrine "allows private parties to sue individual state officials for prospective relief to enjoin ongoing violations of federal law." *MCI Telecomms. Corp. v. Ill. Bell Tel. Co.*, 222 F.3d 323, 337 (7th Cir. 2000) (citations omitted). There is a longstanding rationale that underlies this doctrine: "[B]ecause an unconstitutional legislative enactment is 'void,' a state official who enforces that law 'comes into conflict with the superior authority of the Constitution,' and therefore is 'stripped of his official or representative character and is sub-

jected in his person to the consequences of his individual conduct.'" *Va. Office for Prot. & Advocacy v. Stewart*, 131 S. Ct. 1632, 1638 (2011) (quoting *Ex parte Young*, 209 U.S. at 159-60). To determine whether Governor Quinn and Director Weems may be so stripped of the official character of their positions, we "'need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Ind. Prot. & Advocacy Servs.*, 603 F.3d at 371 (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).

The first part of that inquiry—whether the complaint alleges an ongoing violation of federal law—is readily satisfied here: Council 31 alleges that the Rules put into place by Governor Quinn and Director Weems violate the Contracts Clause of the U.S. Constitution because those Rules deny the affected employees their wage increases due under the collective bargaining agreements (as modified by subsequent cost-savings agreements). But the second part of the inquiry—whether the relief sought is properly characterized as prospective—is problematic for Council 31. To be clear, Council 31 seeks two forms of relief under its Contracts-Clause claim: injunctive relief from the Rules and a declaratory judgment that the State's actions violated the Contracts Clause. We address both forms of relief in turn.

The Supreme Court has held that "*Ex parte Young* cannot be used to obtain an injunction requiring the payment of funds from the State's treasury . . . or an order for specific performance of a State's contract." *Va. Office for Prot. &*

*Advocacy*, 131 S. Ct. at 1639. True, prospective relief of an ongoing federal violation will often require state officials to dip into a state's treasury to comply with a court's order. *Edelman*, 415 U.S. at 668. "Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in *Ex parte Young*." *Id.* Nevertheless, where a plaintiff's request for relief "would have an effect upon the state treasury that is not merely ancillary but is the essence of the relief sought," it is barred by the Eleventh Amendment. *MSA Realty Corp. v. State*, 990 F.2d 288, 293 (7th Cir. 1993).

Therefore, it is necessary to look not at the type of relief sought, but the effect the relief would have on the State if it were afforded to the plaintiff. In doing so, we recount the case of *MSA Realty*, which bears a resemblance to our own. In that case, the plaintiff corporation purchased all of the tax increment revenue bonds that were issued by the Village of Buffalo Grove, Illinois. *Id.* at 289. By law, the Village could only make the interest and principal payments due on the bonds out of real property and state and local sales tax increments— amounts that were ultimately controlled by the State. *Id.* Therefore, when the State General Assembly subsequently reduced the amount of tax increment revenues that would be returned to municipalities, the Village necessarily had to reduce the amount of payments that the plaintiff corporation was owed on its bonds. *See id.* at 289-90. The plaintiff sued, seeking a declaratory judgment that the State's reduction in tax increment revenues constituted a violation of the Contracts Clause, and also an injunction that would require the State to

return the full amount of tax increment revenues to the Village of Buffalo Grove, which would in turn be able to pay the debt service on its bonds. *Id.* at 290. The State asserted an Eleventh Amendment defense to the plaintiff's claims. *Id.*

We addressed the plaintiff's request for injunctive relief by noting that "merely labeling the relief sought as injunctive does not defeat the eleventh amendment bar to suits that seek relief from the state treasury." *Id.* at 295. Rather, the inquiry must go deeper, and so we concluded as follows:

> [T]he eleventh amendment bars a claim for injunctive relief such as [the plaintiff's] that would require direct payments by the state from its treasury for the indirect benefit of a specific entity, or that seeks to require state officials to carry out a task that only the state can perform in its political capacity, such as fulfilling promises made allegedly to [tax increment fund] districts such as the Village of Buffalo Grove, or that seeks relief that cannot be considered merely ancillary to achieving compliance with a determination of a substantive federal constitutional wrong.

*Id.* In addition, we rejected the plaintiff's request for declaratory judgment because such "relief should not be awarded where the eleventh amendment bars an award of monetary or injunctive relief; otherwise the [declaratory] relief would operate as a means of avoiding the amendment's bar." *Id.* The rationale for this holding is sound: "For the federal court to declare that defendants have violated the impairment of contracts

clause in the past would give [a plaintiff] a judgment that would have res judicata effect in state court on the issue of liability." *Id.*

In this case, like the plaintiff in *MSA Realty*, Council 31 seeks an injunction that would result in payments being made out of the State's treasury. Council 31 attempts to distinguish its requested injunctive relief from that sought by the plaintiff in *MSA Realty* by pointing to the fact that Council 31 seeks only to enjoin the Rules that implemented the pay freeze; conversely, the plaintiff in *MSA Realty* sought relief "through an order directing the payment of certain funds out of the state treasury to the Buffalo Grove [tax increment fund] district for the ultimate benefit of [the plaintiff]." *Id.* at 292. In other words, Council 31's request for injunctive relief does not specifically require the court to direct payment of funds out of the State's treasury, while the plaintiff in *MSA Realty* did seek direct payment. This distinction is immaterial. Council 31's argument ignores our holding that "the eleventh amendment bars a claim for injunctive relief . . . that would require direct payments by the state from its treasury for the indirect benefit of a specific entity." *Id.* at 295. It does not matter that the injunction in this case would preclude State officials from enforcing the Rules without explicitly directing payment from the State's treasury; the effect of issuing the injunctive relief Council 31 seeks in this case is the same as the effect of the relief sought by the plaintiff in *MSA Realty*—the injunction would force the defendants, acting in their official capacities, to extract funds from the State's treasury for the ultimate benefit of the plaintiffs. There

is thus no question that the "essence of the relief sought" is the payment of funds out of the treasury to the employees at the 14 state agencies whose budgets did not contain sufficient appropriations to pay wage increases. *Id.* at 293; *see also Va. Office for Prot. & Advocacy*, 131 S. Ct. at 1639 ("*Ex parte Young* cannot be used to obtain an injunction requiring the payment of funds from the State's treasury . . . ."). Accordingly, the injunctive relief sought in this case does not have a "merely ancillary" effect on the State's treasury, the *Ex parte Young* doctrine does not apply, and the Eleventh Amendment bars Council 31's request for an injunction under its Contracts-Clause claim. *MSA Realty Corp.*, 990 F.2d at 293.

We also observe that the defendants raised the Eleventh Amendment defense against the entirety of Council 31's Contracts-Clause claim. This includes not only Council 31's request for a preliminary injunction but also its request for declaratory judgment. But neither the district court's order nor the parties' briefs on appeal address the Eleventh Amendment's application to Council 31's request for declaratory judgment. Nevertheless, the reasoning of *MSA Realty* applies with equal force here: "[D]eclaratory relief should not be awarded where the eleventh amendment bars an award of monetary or injunctive relief; otherwise the [declaratory] relief would operate as a means of avoiding the amendment's bar." *Id.* at 295. Therefore, the Eleventh Amendment bars all relief that Council 31 seeks under its Contracts-Clause claim.

## B.  Failure to State a Claim

Council 31 also challenges the district court's ruling that it failed to adequately state either a Contracts-Clause or an Equal Protection claim. We will address each claim in turn.

We review de novo a district court's dismissal of a plaintiff's claims for failure to state a claim on which relief may be granted. *Graczyk v. W. Publ'g Co.*, 660 F.3d 275, 278 (7th Cir. 2011) (citing *Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 399 (7th Cir. 2011)). Our focus at this stage is on the complaint; we will construe all well-pleaded alleged facts, and draw all reasonable inferences, in a light most favorable to the plaintiff. *Id.* at 279. Although "[t]he plaintiff need not . . . plead 'detailed factual allegations,'" *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1947, 1949 (2009)), "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## 1.  Contracts-Clause Claim

Even if the Eleventh Amendment did not bar Council 31's Contracts-Clause claim, that claim would still fail because Council 31 has not stated a cognizable claim. The Contracts Clause of the U.S. Constitution provides that "No state shall enter into any . . . Law impairing the

Obligation of Contracts . . . ." U.S. CONST. art. I, § 10. To succeed on a Contracts-Clause claim, a plaintiff must demonstrate that a "change in state law has 'operated as a substantial impairment of a contractual relationship.'" *Gen. Motors Corp. v. Romein*, 503 U.S. 183, 186 (1992) (quoting *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 200, 411 (1983); *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)). This inquiry requires the plaintiff to show (1) that there is a contractual relationship, (2) that a change in law has impaired that relationship, and (3) that the impairment is substantial. *Id.*; *see also Khan v. Gallitano*, 180 F.3d 829, 832 (7th Cir. 1999). The parties dispute both aspects of the second element (whether there has been a change in law, and, if so, whether any change in law caused an impairment of the contractual relationship) as well as the third element (whether any impairment is substantial). We need not wade into all of these disputes, however, because we believe that the issue of impairment settles the matter.[4] And so we will address only

---

[4] We recognize that, even if the Rules constituted a substantial impairment of the collective bargaining agreements, the defendants may still be justified in acting as they did if they can show that the Rules were "reasonable and necessary to meet an important social problem." *E&E Hauling, Inc. v. Forest Preserve Dist.*, 613 F.2d 675, 681 (7th Cir. 1980) (citing, *inter alia*, *Allied Structural Steel Co.*, 438 U.S. at 242-44). Here, the important social problem that the State sought to fix by decreasing appropriations to the 14 affected agencies was Illinois's

(continued...)

whether there has been an impairment of the contractual relationship in this case.

Council 31 argues that "[c]ourts find impairment where, as here, the express terms of the labor agreement create the right or benefit in question because one can presume that the parties to a contract have relied heavily on the explicit benefits set forth in that contract." This argument describes a classic breach of contract action. But we have rejected the notion that a breach of contract alone is enough to constitute a constitutional impairment of a contractual obligation. *Horwitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1250 (7th Cir. 1996). And for good reason: "The essence . . . of a breach of contract is that it triggers a duty to pay damages for the reasonably foreseeable consequences of the breach. If

---

[4] (...continued)

fiscal deficit. Council 31 contends that the Rules are not a reasonable and necessary means to remedy this problem and then offers a number of alternative courses of action. But because "[a] state . . . reserve[s] broad power to adopt regulations to protect the public without being concerned with upsetting contractual obligations," *id.*, Council 31 must demonstrate (or, at this stage of the case, plausibly allege) that at least one of those alternatives is a more moderate course of action than the Rules, and that the alternative would serve the purpose of meeting the State's fiscal needs equally well. *See U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 30-31 (1977). It is doubtful that Council 31 has met that burden here; therefore, we are inclined to defer to the State's broad power to protect its citizens.

the duty [to pay damages] is unimpaired, the obligation of the contract cannot be said to have been impaired." *Id.* at 1251. So our inquiry does not focus on whether Council 31 has adequately pleaded a breach of contract claim (it most certainly has), but rather on "whether [the State] . . . set up a defense that prevented [Council 31] from obtaining damages, or some equivalent remedy, for the breach." *Id.*

Here, Council 31 argues only that the Rules constitute an unconstitutional impairment of the collective bargaining agreements. This argument can prevail only if the Rules are a defense that the State has set up to prevent Council 31 from obtaining damages for breach of contract. And so we will briefly examine the State's defense in the aforementioned state court proceedings to determine whether the Rules foreclose a remedy for breach of contract.

It is clear that they do not. Indeed, Council 31 has already prevailed at arbitration on its breach of contract claim, and in the subsequent suit filed by the State in state court to vacate the arbitration award, the State's defense is not predicated on the Rules. Rather, the State's defense is based on the application of Section 21 of the Illinois Public Sector Relations Act, which states that the negotiation of collective bargaining agreements is "[s]ubject to the appropriation power of the employer [which is the State]." 5 Ill. Comp. Stat. 315/21. Accordingly, the State has argued that appropriations are a condition precedent to the wage increases being paid. Because plenary appropriation authority lies with the legislative

branch, the State asserts that the executive branch's hands are tied by the appropriations doled out by the General Assembly and so the State cannot be held liable for a breach of contract when, because of a lack of appropriations, insufficient funds exist to fulfill a contractual obligation.

This argument is consistent with the State's rationale for enacting the rules, as stated in Director Weems's July 1 memorandum: "[D]ue to the absence of sufficient appropriations by the General Assembly, the above listed agencies cannot implement the FY12 increases." In other words, the Rules simply implemented a payment plan that had been dictated by legislative fiat. Ultimately, whether the State prevails in state court will not rest on the court's construction of the Rules, but rather on the court's application of Section 21 of the Illinois Public Sector Relations Act—specifically, whether the court accepts the State's argument that Section 21 establishes the notion that appropriations are a condition precedent to the State meeting its contractual obligations. Thus, the Rules do not foreclose a remedy for breach of contract, and no impairment of a contractual obligation exists. Council 31 has failed to state a cognizable Contracts-Clause claim.

## 2. Equal Protection Claim

Finally, Council 31 argues that the district court erred in holding that it failed to adequately state an Equal Protection claim. The Fourteenth Amendment's Equal Protection Clause requires that "'all persons similarly situated . . . be treated alike.'" *United States v. Brucker*, 646

F.3d 1012, 1017 (7th Cir. 2011) (quoting *United States v. Nagel*, 559 F.3d 756, 760 (7th Cir. 2009)). But Equal Protection claims are subject to different degrees of scrutiny depending on the individual rights or the class of persons at issue. As Council 31 acknowledges, "[t]he proper level of scrutiny in this circumstance is the rational relationship test, for our case does not involve a fundamental right, and there is no suspect class." *Discovery House, Inc. v. Consol. City of Indianapolis*, 319 F.3d 277, 282 (7th Cir. 2003). Under that standard, the applicable government regulation will be upheld " 'if there is a rational relationship between the disparity of treatment and *some* legitimate governmental purpose.' " *Brucker*, 646 F.3d at 1017 (emphasis in original) (quoting *Smith v. City of Chicago*, 457 F.3d 643, 652 (7th Cir. 2006)).

Council 31 contends that, at this early stage of the proceedings, it is improper to determine whether paying raises to employees in some agencies but not to the 30,000 employees in the 14 affected agencies is rationally related to a legitimate governmental purpose. Council 31 states that it is enough that it has pleaded an Equal Protection claim at this stage of the proceedings. Later on, Council 31 argues, its claim will be tested against the legitimate governmental purpose that the defendants have proffered as their rationale for implementing the Rules.

Council 31's argument ignores the heavy burden a plaintiff bears when asserting an Equal Protection claim that is subject only to rational-basis scrutiny. As noted above, the defendants must identify only "some" (in other

words, at least one) legitimate governmental purpose. Stated another way, Council 31 must plausibly allege that no reasonably conceivable set of facts supports the pay freeze as a rational instrument of cost savings. *See Discovery House, Inc.*, 319 F.3d at 282. Here, the parties agree that the State has encountered a fiscal crisis that will cause the State to run out of money by the end of the fiscal year. Instituting cost-savings measures is unquestionably a legitimate governmental interest, particularly for a government in such dire fiscal straits. And by Council 31's own admission the State would save approximately $75 million by implementing the pay freeze. It is therefore evident that the Rules are a rational method of contributing to the legitimate governmental aim of cost savings. Accordingly, the district court properly granted the defendants' motion to dismiss Council 31's Equal Protection claim.

### III.

The Eleventh Amendment bars Council 31's Contracts-Clause claim because the essence of the relief that it seeks is the payment of funds out of the treasury. Council 31 also failed to state a Contracts-Clause claim because it did not adequately allege that the Rules unconstitutionally impaired the collective bargaining agreements. Finally, Council 31 failed to state an Equal Protection claim because there is a rational relationship between the Rules and the legitimate governmental purpose of cost savings. Because we hold that the district court correctly dismissed both claims at issue,

we necessarily hold that the district court also correctly denied Council 31's motion for a preliminary injunction. For these reasons, the district court is AFFIRMED.